**Opinion issued September 17, 2019**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-15-01089-CR

_____

**JASON RAMJATTANSINGH, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the County Criminal Court at Law No. 8**
**Harris County, Texas**
**Trial Court Case No. 2019635**

---

# O P I N I O N

Jason Ramjattansingh appeals his conviction for Class A misdemeanor driving while intoxicated. *See* TEX. PENAL CODE § 49.04. This Court first rendered a judgment of acquittal on the charge and remanded for a new trial on the lesser-

included Class B misdemeanor offense.[1] The State appealed, and the Court of Criminal Appeals reversed.[2] The case is now on remand for consideration of Ramjattansingh's issues not reached in the Court's first opinion, whether the trial court erred by (1) denying his requests for jury instructions on unlawful arrests and custodial interrogation; (2) refusing to allow his counsel to present jury argument on the unlawfulness of the arrest; and (3) admitting an audio recording of the call for emergency assistance from a tow truck driver who observed Ramjattansingh driving erratically the night of his arrest.

We affirm.

## Background

### A.     The offense

In spring 2015, at 9:32 p.m., tow truck driver Joshua Wilson dialed 911 to report that he was following a "drunk driver" who was "all over the road" and had almost caused multiple accidents. Wilson described the vehicle to the 911 operator and provided the license plate number. Not long after Wilson made the call, he and the driver he was following, Jason Ramjattansingh, pulled off the road into a public parking lot. Wilson relayed their location over the phone and agreed to stay in the parking lot with his tow truck's lights flashing until the police arrived.

---

[1]     *Ramjattansingh v. State*, 530 S.W.3d 259, 260 (Tex. App.—Houston [1st Dist.] 2017), *rev'd*, 548 S.W.3d 540 (Tex. Crim. App. 2018).

[2]     *Ramjattansingh v. State*, 548 S.W.3d 540, 548–52 (Tex. Crim. App. 2018).

Officer S. Delacruz of the Houston Police Department responded. Both Wilson and Ramjattansingh were standing outside Ramjattansingh's car when Officer Delacruz arrived. Officer Delacruz spoke first with Wilson, who told him that Ramjattansingh had been driving erratically and nearly hit other vehicles. Officer Delacruz noticed that Ramjattansingh was "swaying," "couldn't stand straight," and seemed intoxicated. Officer Delacruz handcuffed Ramjattansingh and secured him in the patrol car at 9:48 p.m. as he awaited the arrival of a DWI unit.

Officer A. Beaudion arrived around 10:05 p.m. to conduct the DWI investigation. She took Ramjattansingh out of Officer Delacruz's patrol car and removed his handcuffs. Ramjattansingh smelled of alcohol, could not balance himself, and had slurred speech. He admitted to Officer Beaudion that he had "some shots of alcohol" and that he had started drinking around 5:00 p.m.

As part of her investigation, Officer Beaudion administered three field sobriety tests—the horizontal gaze nystagmus (HGN) test, the one-leg stand test, and the walk-and-turn test. Ramjattansingh could not complete the HGN test because he could not hold his head still. And he showed signs of intoxication during the other two tests—three of four clues on the one-leg stand test and six of eight clues on the walk-and-turn test. By 10:40 p.m., Officer Beaudion had concluded that Ramjattansingh was "very intoxicated." She gave him his statutory warning that he was under arrest, arrested him, and took him to HPD's intoxication center. There, at

3

around 11:30 p.m., Ramjattansingh gave two breath samples, the results of which showed alcohol concentrations of .235 and .220 per 210 liters of breath.

## B.    The trial

The State charged Ramjattansingh with driving while intoxicated and, in addition, alleged that his breath showed an alcohol concentration of at least .15 "at the time of the analysis and at or near the time of the commission of the offense," thereby elevating the offense from a Class B to a Class A misdemeanor. *See* TEX. PENAL CODE § 49.04(b), (d). Ramjattansingh's plea of "not guilty" led to a jury trial.

Ramjattansingh filed a written motion to suppress "all evidence seized as a result of [his] arrest . . . and the search of [his] person, papers, and effects, as well as all statements, either written or oral, made after arrest." The motion alleged that the "arrest and search of [Ramjattansingh] and the seizure of items, papers and effects from [Ramjattansingh] was affected without valid warrant, or probable cause, or reasonable suspicion, in violation of the Fourth and Fourteenth Amendments" of the United States Constitution.

At argument on the suppression motion, Ramjattansingh urged that the State's evidence stemmed from an illegal detention by the tow truck driver, Wilson, and then an illegal arrest by Officer Delacruz. Wilson unlawfully detained him until the police arrived, and Officer Delacruz unlawfully arrested him without probable cause by handcuffing him and placing him in the patrol car. Or, Ramjattansingh argued in

4

the alternative, if Officer Delacruz was only detaining him, his detention became an arrest when Officer Delacruz towed Ramjattansingh's car, which Ramjattansingh alleged occurred before Officer Beaudion arrived and conducted the DWI investigation.

The trial court denied the motion and later issued these relevant findings of fact and conclusions of law:

### FINDINGS OF FACT

g. Officer Delacruz spoke to the tow truck driver [Wilson] [who] stopped [Ramjattansingh] . . . and explained to Officer Delacruz that:

> (i) he had been following [Ramjattansingh] when they were driving;
>
> (ii) [Ramjattansingh] was almost hitting vehicles;
>
> (iii) [Wilson] had to pull [Ramjattansingh] off the road; and
>
> (iv) after they stopped, [Wilson] approached [Ramjattansingh] and observed signs that suggested [Ramjattansingh] was intoxicated.

h. Officer Delacruz observed that [Ramjattansingh] was standing outside his vehicle, could not stand still, and was swaying.

i. Officer Delacruz determined, based on a totality of the circumstances, that [Ramjattansingh] could not safely operate a motor vehicle.

j. Because a Houston Police Department officer that was specially trained in DWI investigations was already on the way, Officer Delacruz did not perform further investigation but, instead, handcuffed [Ramjattansingh] and detained him in Officer Delacruz's patrol car until the DWI officer arrived.

5

k. Among other things, Officer Delacruz detained [Ramjattansingh] in his patrol car for [Ramjattansingh's] own safety—to keep [Ramjattansingh] from falling down.

CONCLUSIONS OF LAW

18. A private citizen may arrest an individual that breaches the peace in his presence. TEX. CODE CRIM. PROC. art. 14.01(a) [(providing that "peace officer or any other person, may, without a warrant, arrest an offender when the offense is committed in his presence or within his view, if the offense is . . . an offense against the public peace")].

. . .

24. Here, [Wilson] had probable cause to believe that [Ramjattansingh] committed the offense of reckless driving, in a manner constituting the breach of the peace, in his presence and view.

25. [Wilson] was authorized to arrest [Ramjattansingh] for reckless driving.

. . .

27. Notwithstanding probable cause to arrest [Ramjattansingh] for reckless driving, the first responding officer, Delacruz, had reasonable suspicion to detain [Ramjattansingh] for suspicion of reckless driving and driving while intoxicated—based on the 911 call and dispatch information, his conversations with the tow truck driver, and his personal observations of the defendant, coupled with his own training and experience—until the already-dispatched DWI investigation officer arrived and conducted her investigation. . . .

28. Officer Delacruz's act of handcuffing [Ramjattansingh] and placing [Ramjattansingh] in the back seat of his patrol car to await Officer Beaudion did not elevate the detention to an arrest. . . .

29. Reasonable suspicion to justify [Ramjattansingh's] detention did not dissipate at any time before probable cause existed to support his arrest.

6

30. [Ramjattansingh's] detention by Officer Delacruz, and later arrest by Officer Beaudion, was reasonable and, thus, did not violate the Fourth Amendment or its counterpart.

During the State's case, Officers Delacruz and Beaudion testified about the DWI investigation and the circumstances of the arrest. Officer Delacruz contradicted himself about towing Ramjattansingh's car. Officer Delacruz first testified that the time recorded on the HPD form towing slip—10:00 p.m.—was the time he began filling out paperwork, not when Ramjattansingh's car was towed. Officer Delacruz testified on cross-examination, however, that the car was towed at 10:00 p.m., a time which he acknowledged was before Officer Beaudion arrived and before he could authorize a tow under HPD's policy for vehicle tows incident to arrest. Officer Beaudion testified that Ramjattansingh's car was in the parking lot when she arrived.

The State also presented testimony from M. Skeleton, an HPD employee who administered Ramjattansingh's breath test, and C. Bishop, a technical supervisor for the Texas Department of Public Safety Breath Alcohol Testing Program. Bishop opined that an average person would have to drink about 11 shots to produce a result of .220 on a breath test and that someone with that alcohol concentration would have lost the normal use of his physical and mental faculties. She conceded, however, that she could not say what Ramjattansingh's alcohol concentration was when he was driving and that any attempt to do so would be speculative. She testified that retrograde extrapolation—extrapolating backward in time from breath test results to

7

estimate an alcohol concentration at an earlier point—is possible. But the facts that must be known to make such an extrapolation—the time of the traffic stop, the time of the breath test and its results, the driver's last meal, what he ate, and the time of his last alcoholic drink—were unknown.

Bishop also conceded that, given the limited facts available and how the body processes alcohol, it was possible that Ramjattansingh's alcohol concentration was below the legal limit of .08 when he was driving. For example, if he quickly drank several alcoholic beverages before getting behind the wheel, his alcohol concentration could have been below the legal limit while driving but later tested higher because his alcohol concentration would have increased over time.

After the close of evidence and based on Officer Delacruz's conflicting testimony about the timing of the tow, Ramjattansingh requested an exclusionary-rule instruction under Article 38.23 of the Code of Criminal Procedure on the lawfulness of his arrest and a voluntariness instruction under article 38.22 for his statements to Officer Beaudion. *See* TEX. CODE CRIM. PROC. arts. 38.22–.23. The trial court denied the requested jury instructions and then denied Ramjattansingh's related request to allow jury argument on the lawfulness of his arrest.

The trial court charged the jury on both the Class A and the lesser-included Class B misdemeanor offenses of driving while intoxicated. *See* TEX. PENAL CODE § 49.04. As for the Class A misdemeanor, the charge instructed the jury that it could

8

find Ramjattansingh guilty if it found that he drove while intoxicated with a "breath analysis of at least .15 at the time of the analysis, and at or near the time of the commission of the offense, as charged in the Information." And, that is what the jury found, leading to a conviction for the Class A misdemeanor offense.

## C.      Ramjattansingh's appeal to this Court

Ramjattansingh appealed the conviction. In our original opinion, this Court sustained his first appellate issue, which asserted that the evidence was legally insufficient to sustain the jury's guilty finding on the Class A misdemeanor offense under the charge given to the jury. *See Ramjattansingh*, 530 S.W.3d at 264. The Court noted that the DWI statute "merely requires a defendant to have an alcohol concentration of .15 at the time of analysis to elevate the offense to a Class A misdemeanor." *Id.* at 262. But the State's information alleged more: "that Ramjattansingh had an alcohol concentration of .15 or more both at the time of the analysis *and* at or near the time of the offense." *Id.* (emphasis added). By alleging more, the Court held, the State was required to prove its allegations that went beyond the statutory elements. *Id.* at 263.

Because this Court sustained Ramjattansingh's sufficiency challenge, the Court did not reach his issues alleging additional trial errors. *Id.* at 265. The Court reversed Ramjattansingh's conviction for the Class A misdemeanor of driving while

9

intoxicated, rendered a judgment of acquittal on that offense, and remanded for a new trial on the lesser-included Class B misdemeanor offense. *Id.*

**D.     The State's further appeal to the Court of Criminal Appeals**

The Court of Criminal Appeals granted review on "whether the State's choice to include the extra element of 'at or near the time of the commission of the offense,' in the Class A allegation in this case, and its acquiescence in a jury charge including that same extra element" meant that the reviewing court should assess the sufficiency of the evidence against the charge given, rather than a hypothetically correct charge without the extra element. *See Ramjattansingh*, 548 S.W.3d at 545. And the Court of Criminal Appeals reversed this Court's ruling because, "[i]f a jury instruction includes the elements of the charged crime but incorrectly adds an extra, made-up element, a sufficiency challenge is still assessed against the elements of the charged crime, regardless of the source of the extra element." *Id.* at 552. The Court of Criminal Appeals remanded "for proceedings consistent with [its] holding." *Id.*

Because Ramjattansingh's sufficiency argument hinged on its contention that the state was required to prove the erroneously heightened element contained in the charge, the Court of Criminal Appeals's decision that sufficiency is assessed against a hypothetically correct charge disposed of his sufficiency challenge. We now turn to Ramjattansingh's four remaining issues on remand.

10

**Jury Instructions on Unlawful Arrest and Custodial Interrogation**

In his second and third issues, Ramjattansingh contends that some evidence showed that Officer Delacruz arrested him without probable cause, rather than merely detaining him until Officer Beaudion arrived to investigate whether he had driven while intoxicated, and that his statements to Officer Delacruz and Officer Beaudion he sought to exclude were made while he was unlawfully in custody and before he was given his statutory warnings. *See* TEX. CODE CRIM. PROC. art. 38.22, § 3 (requiring that defendant be warned of rights before custodial interrogation if resulting confession is to be admissible at trial). Ramjattansingh relies on evidence that Officer Delacruz handcuffed and placed him in the back of Officer Delacruz's patrol vehicle and had Ramjattansingh's car towed from the scene before Officer Beaudion arrived. Based on this evidence, Ramjattansingh argues, the trial court should have instructed the jury under Article 38.23—regarding excluding unlawfully obtained evidence—and Article 38.22—regarding voluntariness of statements made in custodial interrogation—to consider whether police obtained the intoxication evidence in violation of Ramjattansingh's rights and to disregard any evidence unlawfully obtained. *See* TEX. CODE CRIM. PROC. art. 38.22, § 3; *id.* art. 38.23(a).

## A.    Standard of review

The trial court must give the jury a written charge that sets forth the law applicable to the case. TEX. CODE CRIM. PROC. art. 36.14; *Oursbourn v. State*, 259 S.W.3d 159, 179 (Tex. Crim. App. 2008). When a party contends that the trial court erred in its charge to the jury, we must determine whether the charge was erroneous and, if so, whether the error was harmful under the appropriate harm-analysis standard. *Celis v. State*, 416 S.W.3d 419, 423 & n.3 (Tex. Crim. App. 2013).

## B.    Jury charge was not erroneous under Article 38.23(a)

The Code of Criminal Procedure prohibits the use of evidence obtained in violation of a defendant's legal or constitutional rights. TEX. CODE CRIM. PROC. art. 38.23(a). Unlawfully obtained means that there is a causal connection between the illegal or unconstitutional conduct about which the defendant complains and the acquisition of the evidence. *Gonzales v. State*, 67 S.W.3d 910, 912 (Tex. Crim. App. 2002). If the evidence raises a material fact issue about whether police obtained evidence in violation of the defendant's rights, the jury must be instructed to disregard that evidence if it believes the evidence was unlawfully or unconstitutionally obtained or if it has a reasonable doubt in this regard. *See Jackson v. State*, 468 S.W.3d 189, 199 (Tex. App.—Houston [14th Dist.] 2015, no pet.).

A material issue of fact requiring this instruction exists only when: (1) the evidence heard by the jury raised an issue of fact; (2) the evidence about that fact

12

was affirmatively contested; and (3) the contested issue of fact was material to the lawfulness of the challenged conduct in obtaining the evidence. *Oursbourn*, 259 S.W.3d at 177; *Serrano v. State*, 464 S.W.3d 1, 7 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd). Thus, the jury instruction must address the parties' disagreement about a "specific historical fact that is material to the legality of obtaining the evidence." *Holmes v. State*, 248 S.W.3d 194, 200 (Tex. Crim. App. 2008). If there is not a dispute about a material fact issue, or if other facts that are not in dispute suffice to support the lawfulness of the challenged conduct, then the trial judge should decide the legality of the conduct as a question of law. *Madden*, 242 S.W.3d at 510. Likewise, if the dispute concerns the legal consequences of undisputed facts, the issue is for the court to decide. *Robinson v. State*, 377 S.W.3d 712, 721–22 (Tex. Crim. App. 2012).

Here, Ramjattansingh and the State disagree about whether Officer Delacruz arrested him or merely detained him. Despite their disagreement, however, only a single historical fact relating to this disagreement was disputed before the jury—whether Officer Delacruz had Ramjattansingh's car towed before Officer Beaudion arrived at the scene and conducted her DWI investigation. Officer Delacruz contradicted himself. He initially said that the towing slip, on which he recorded the time as 10:00 p.m., memorialized when he began filling out the paperwork to have Ramjattansingh's car towed, not when Ramjattansingh's car actually was towed.

13

Officer Delacruz explained that both the car and the wrecker were still in the parking lot when Officer Beaudion arrived at 10:05 p.m. But Officer Delacruz later testified that the tow slip's 10:00 p.m. notation showed that Ramjattansingh's car was towed at that time—before Officer Beaudion arrived—and that he had no legal authority to tow Ramjattansingh's car then. For her part, Officer Beaudion said that Ramjattansingh's car was still on scene when she arrived.

We conclude that Ramjattansingh was not entitled to a jury instruction under Article 38.23 because the lone contested fact issue—whether his car was towed before or after Officer Beaudion's arrival—was immaterial to the lawfulness of the challenged conduct in obtaining the evidence of his intoxication.

Ramjattansingh contends that Officer Delacruz arrested him without probable cause, rather than detaining him for investigation, based on Officer Delacruz's concession that he had not investigated whether Ramjattansingh committed a crime but had handcuffed him, placed him in the back of the patrol car, and towed his car. This last circumstance, Ramjattansingh argues, reveals he was arrested because, as Officer Delacruz testified, HPD policy provides for the towing of vehicles only after an arrest. But, as the trial court found in its findings and conclusions, Officer Delacruz had reasonable suspicion to detain Ramjattansingh for both reckless driving and driving while intoxicated before Officer Beaudion arrived to conduct her investigation. Officer Delacruz's acts of handcuffing and placing Ramjattansingh in

14

a patrol car did not transform the detention into an arrest. Whether the timing of the later towing of Ramjattansingh's car is evidence of an arrest, it does not affect the lawfulness of any arrest. Assuming Officer Delacruz arrested Ramjattansingh, the timing of the tow is unrelated to whether there was probable cause for an arrest.

Because the timing of the tow is immaterial to the lawfulness of Officer Delacruz's ostensible arrest of Ramjattansingh, a jury finding that the car was towed before Officer Beaudion conducted the DWI investigation could not serve as a basis for the jury to disregard the evidence that Ramjattansingh smelled of alcohol, had poor balance and slurred speech, admitted he had "some shots of alcohol" and had started drinking around 5:00 p.m., and showed signs of intoxication during certain field sobriety tests. *See Holmes*, 248 S.W.3d at 200 (jury instruction must address parties' dispute about "specific historical fact that is material to the legality of obtaining the evidence"); *see also, e.g.*, *Madden*, 242 S.W.3d at 517–18 (trial court did not err by refusing to instruct jury where disputed fact would not affect lawfulness of detention). The trial court did not err by refusing to instruct the jury under Article 38.23(a), and we overrule Ramjattansingh's second issue. *See Madden*, 242 S.W.3d at 510, 517–18; *Serrano*, 464 S.W.3d at 7.

## C.   Any jury charge error under Article 38.22 was harmless

"A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion."

15

TEX. CODE CRIM. PROC. art. 38.21. A defendant may claim his statement was not freely and voluntarily made under several different theories: "(1) Article 38.22, § 6—general voluntariness; (2) *Miranda v. Arizona*[3] as expanded in Article 38.22, §§ 2 and 3 (the Texas confession statute); or (3) the Due Process Clause." *Oursbourn*, 259 S.W.3d at 169 (internal footnotes omitted). "The theory of involuntariness determines whether and what type of an instruction may be appropriate. Thus, the first step in deciding upon an appropriate jury instruction is identifying the theory of involuntariness." *Id.* (internal footnotes omitted).

On appeal, Ramjattansingh asserts involuntariness under Article 38.22. Article 38.22 aims to protect suspects from police overreaching. *Id.* at 172. Yet, as the Court of Criminal Appeals explained:

> Section 6 of that article may also be construed as protecting people from themselves because the focus is upon whether the defendant voluntarily made the statement. Period. Does it appear—as Article 38.21 requires—that the statement was freely and voluntarily made without compulsion or persuasion? Or, in the case of a custodial-interrogation statement, did the suspect "knowingly, intelligently, and voluntarily" waive the rights set out in Article 38.22 § 2(a) or § 3(a)? These inquiries do not turn solely on police overreaching. The behavior of the police may or may not be a factor. A confession given under the duress of hallucinations, illness, medications, or even a private threat, for example, could be involuntary under Article 38.21 and the Texas confession statute.

---

[3]     384 U.S. 436 (1966).

*Id.* (internal footnotes omitted); *see Morales v. State*, 371 S.W.3d 576, 583–84 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) (identifying fact scenarios that could raise claims of involuntariness under Articles 38.21 and 38.22).

There are three types of statutory jury instructions that correspond with the theories of involuntariness: again, "(1) a 'general' Article 38.22, § 6 voluntariness instruction; (2) a 'general' Article 38.22, § 7 warnings instruction (involving warnings given under § 2 and § 3); and (3) a 'specific' Article 38.23(a) exclusionary-rule instruction." *Oursbourn*, 259 S.W.3d at 173. The Section 6 "general" instruction asks the jury in essence, "Do you believe, beyond a reasonable doubt, that the defendant's statement was voluntarily made? If it was not, do not consider the defendant's confession." *Id.* The Section 7 instruction sets out the requirements of Article 38.22, § 2 or § 3 and asks the jury to decide whether all those requirements were met.[4] *Id.* The Article 38.23(a) "specific" instruction, discussed above, is fact-based. *Id.* at 173–74 (stating, as an example of Article 38.23(a) instruction, "Do you believe that Officer Obie held a gun to the defendant's head to extract his statement? If so, do not consider the defendant's confession.").

The Court of Criminal Appeals has acknowledged that "confusion exists about which, if any, jury instruction is appropriate." *Id.* at 174. The Texas statutory

---

[4]     Article 38.22, § 2 and § 3 incorporate the requirements of *Miranda v. Arizona*, 384 U.S. 436 (1966).

claim, which Ramjattansingh asserts on appeal, warrants only an Article 38.22, § 6 "general" voluntariness instruction. "It is the defendant's responsibility to delineate which type of 'involuntariness' he is claiming—a general (perhaps subjective) lack of voluntariness or a specific police-coerced lack of voluntariness"—so that the judge can determine the appropriate instruction. *Id.*

1.      **Article 38.22, § 6 (general voluntariness) instructions**

Article 38.22, Section 6 provides:

In all cases where a question is raised as to the voluntariness of a statement of an accused, the court must make an independent finding in the absence of the jury as to whether the statement was made under voluntary conditions. If the statement has been found to have been voluntarily made and held admissible as a matter of law and fact by the court in a hearing in the absence of the jury, the court must enter an order stating its conclusion as to whether or not the statement was voluntarily made, along with the specific finding of facts upon which the conclusion was based, which order shall be filed among the papers of the cause. Such order shall not be exhibited to the jury nor the finding thereof made known to the jury in any manner. Upon the finding by the judge as a matter of law and fact that the statement was voluntarily made, evidence pertaining to such matter may be submitted to the jury and it shall be instructed that unless the jury believes beyond a reasonable doubt that the statement was voluntarily made, the jury shall not consider such statement for any purpose nor any evidence obtained as a result thereof. In any case where a motion to suppress the statement has been filed and evidence has been submitted to the court on this issue, the court within its discretion may reconsider such evidence in his finding that the statement was voluntarily made and the same evidence submitted to the court at the hearing on the motion to suppress shall be made a part of the record the same as if it were being presented at the time of trial. However, the state or the defendant shall be entitled to present any new evidence on the issue of the voluntariness of the statement prior to the court's final ruling and order stating its findings.

TEX. CODE CRIM. PROC. art. 38.22, § 6.

The language "where a *question* is raised" contrasts with the language in Article 38.22, Section 7 and Article 38.23 which speaks of the *evidence* raising an issue. *Compare* TEX. CODE CRIM. PROC. art. 38.22 § 6 (emphasis added), with TEX. CODE CRIM. PROC. art. 38.22, § 7 ("When the issue is raised by the evidence . . . ."), 38.23(a) ("where the legal evidence raises an issue"). Section 6 contemplates this sequence of events: (1) a party notifies the trial judge that there is an issue about the voluntariness of the confession (or the trial judge raises the issue on his own); (2) the trial judge holds a hearing outside the presence of the jury; (3) the trial judge decides whether the confession was voluntary; (4) if the trial judge decides that the confession was voluntary, it will be admitted, and a party may offer evidence before the jury suggesting that the confession was not in fact voluntary; (5) if the State offers the evidence before the jury, the trial judge gives the jury a voluntariness instruction. *Oursbourn*, 259 S.W.3d at 175. It is only after the defendant notifies the trial judge of the voluntariness issue (or the trial judge raises it on his own) that a chain of other requirements comes into play, triggering the defendant's right to a jury instruction. *Id.*

And Section 6 dictates that the instruction read: "unless the jury believes beyond a reasonable doubt that the statement was voluntarily made, the jury shall not consider such statement for any purpose nor any evidence obtained as a result

19

thereof." TEX. CODE CRIM. PROC. art. 38.22, § 6. Because Section 6 contains its own jury-instruction provision, the jury-instruction provision in Section 7 does not control. *Oursbourn*, 259 S.W.3d at 175 (explaining that "obvious purpose of Section 7 is to authorize and require jury instructions regarding the warnings and safeguards for written and oral statements outlined in Article 38.22, § 2 & § 3 (warnings on the right to remain silent, right to counsel, etc.)").

For that reason, a Section 6 instruction becomes "law applicable to the case" if the parties actually litigate a Section 6 voluntariness issue before the trial court. If the parties litigate the voluntariness issue, the defendant need not specifically request a jury instruction to obligate the court to give one, though a request would still be necessary to obtain the most beneficial harm analysis under *Almanza v. State*. *Ourbsourn*, 259 S.W.3d at 175-176 ("some harm" versus "egregious harm").

2.      **Article 38.22, § 7 (statutory warnings) instructions**

Under Section 7 of Article 38.22, if the defendant made his statement as the result of custodial interrogation, he is also entitled—when the issue is raised by the evidence—to have the jury decide whether he was adequately warned of his rights and knowingly and intelligently waived them:

> When the issue is raised by the evidence, the trial judge shall appropriately instruct the jury, generally, on the law pertaining to such statement.

TEX. CODE CRIM. PROC. art. 38.22, § 7.

The phrase "the issue" refers to compliance with the statutory warnings set out in Sections 2 and 3 of Article 38.22 and the voluntariness of the defendant's waiver of the rights. *Oursbourn*, 259 S.W.3d at 176. For it to be "raised by the evidence" there must be a genuine factual dispute, as under Article 38.23. *Id*. The same procedures—including a hearing outside the presence of the jury and the entry of written findings—that apply to a general voluntariness challenge under Section 6, also apply to a challenge to the sufficiency of warnings and a defendant's voluntary waiver of the rights communicated by those warnings. *Id*. As with Section 6, the trial court's Section 7 jury instructions are "general" ones that set out the pertinent law and legal requirements of Sections 2 and 3 of Article 38.22. *Id.*

### 3. There is not "some harm"

As explained above, Ramjattansingh raised and litigated a general voluntariness issue before the trial court, then a Section 6 instruction became the law applicable to the case, requiring the trial court to give the instruction regardless of whether Ramjattansingh specifically requested it. *Id.* at 176, 180. If Ramjattansingh was entitled to a Section 6 instruction but did not request it, however, we must review the effect of the instruction's omission for egregious harm. *See id.* at 182 & n.89; *see also Almanza,* 686 S.W.2d at 171.

At trial, Ramjattansingh challenged the voluntariness of his oral statements to Officer Beaudion. Both in a motion to suppress and in hearings outside the jury's

21

presence, Ramjattansingh asserted that those statements were involuntary because he already was under arrest when the DWI investigation began (because Officer Delacruz handcuffed him, restrained him in the back of a patrol car, and towed his car) but had not yet received his *Miranda* warnings. The trial court denied Ramjattansingh's motion to suppress and subsequent objections and admitted Officer Beaudion's testimony about the DWI investigation and the video-recording of the investigation into the evidence.

We conclude that because Ramjattansingh raised and litigated the voluntariness of his oral statements to Officer Beaudion, Article 38.22, Section 6 became the law applicable to the case, and the trial court had a duty to prepare a jury charge that accurately set out the law. *See Oursbourn*, 259 S.W.3d at 176, 179; *see also* TEX. CODE CRIM. PROC. art. 36.14. Because it prepared a charge that did not include any voluntariness instruction, the trial court erred by not accurately setting out the law. *Oursbourn*, 259 S.W.3d at 176, 179.

Ordinarily, we would next determine whether we evaluate the error for some harm or for egregious harm. Nowhere in the record do we find a request from Ramjattansingh for a Section 6 instruction, the instruction he contends on appeal the trial court should have given. *See* TEX. CODE CRIM. PROC. art. 38.22, § 6; *Oursbourn*, 259 S.W.3d at 169, 173–74 (making it defendant's burden to specify his involuntariness theory). Instead, Ramjattansingh made this request:

22

> I have another one [request for jury instruction]. This one is actually under 38.22, that I still assert that my client was . . . was placed in custody by Officer Delacruz, prior to Officer Beaudion's arrival, that he made statements to Officer Beaudion afterward that, I think, are subject to 38.22 Section 3 which require statutory warnings under 38.22 Section 2(a). Those were not given in this case. He was not Mirandized or given any statutory warnings under the Code of Criminal Procedure that would inform him that he has a right to remain silent and not answer the officer's questions after he's been handcuffed, placed in the back of a car, and by some of the evidence his vehicle towed.

Given the references to the statutory warnings contemplated by Sections 2 and 3 and *Miranda v. Arizona*, we construe this request as one for a "general" warnings instruction under Section 7. *See* TEX. CODE CRIM. PROC. art. 38.22, § 2 (providing that accused's written statement made as result of custodial interrogation is not admissible unless, before making statement, accused received warnings about right to remain silent, right to have attorney, and right to terminate interview); *id.* art. 38.22, § 3 (requiring same warnings before oral statements made as result of custodial interrogation are admissible); *id.* art. 38.22, § 7 ("When the issue is raised by the evidence, the trial judge shall appropriately instruct the jury, generally, on the law pertaining to such statement."); *see also Oursbourn*, 259 S.W.3d at 173.

We need not decide which harm standard applies because even under that lesser "some harm" standard, the trial court's error is not reversible. Under the "some harm" standard, reversal is required if the error is "calculated to injure the rights of the defendant," which means there must be "some harm" to the defendant. *Almanza*, 686 S.W.2d at 171. "Although the 'some harm' standard is 'less stringent,' it

nonetheless requires a reviewing court to determine actual, rather than mere theoretical, harm." *State v. Sciacca*, 518 S.W.3d 460, 464 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (citing *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013)); *Johnson v. State*, 981 S.W.2d 759, 761–64 (Tex. App.—Houston [1st Dist.] 1998, pet. ref'd) (concluding that potential for harm is inadequate and that record lacked evidence of actual harm.).

While the error here had the potential to harm Ramjattansingh, neither the record nor Ramjattansingh's arguments persuade us that any harm was realized here. To determine harm, we consider the following: (1) the jury charge as a whole; (2) the arguments of counsel; (3) the entirety of the evidence; and (4) any other relevant factors present in the record. *Reeves*, 420 S.W.3d at 816.

The third factor is dispositive here. Ramjattansingh did not put to the jury the issue of whether his statements to Officer Beaudion were involuntary because he had not received his warnings. Given that Ramjattansingh did not draw the jury's attention to a lack of warnings, it is less likely the jury was influenced by the omission of a jury instruction than by the weight of the probative evidence itself. *See Johnson*, 981 S.W.2d at 763 (noting that "state of the evidence, including the contested issues and weight of probative evidence, is the most important factor in the analysis").

Even without Ramjattansingh's oral statements to Officer Beaudion regarding his drinking, the entirety of the evidence adduced at trial strongly supported the jury's verdict. The jury heard the audio-recording of Wilson's call for emergency assistance, where Wilson reported that Ramjattansingh was driving erratically and had nearly caused multiple accidents. Officer Delacruz observed signs that Ramjattansingh was intoxicated, specifically that Ramjattansingh was swaying and unable to stand still. Officer Beaudion observed a strong smell of alcohol on Ramjattansingh's breath and testified that he indicated multiple clues for intoxication on the one-leg and walk-and-turn field sobriety tests and could not complete the HGN because he could not hold his head still. The jury could watch Ramjattansingh's poor performance on the field-sobriety tests in the video-recording. And the State presented evidence of Ramjattansingh's breath samples showing a breath alcohol content in excess of the legal limit.

The second factor, the arguments of counsel, is also in the State's favor. Although the State referenced Ramjattansingh's statements to Officer Beaudion in its summation of the evidence in closing argument, it did not emphasize them. And neither did Ramjattansingh. His closing focused on what he perceived were other weaknesses in the State's case, including that the State did not have any testimony from Wilson, that Officer Delacruz had not investigated how long Ramjattansingh

had been stopped before Officer Delacruz was on scene, and that the State did not prove Ramjattansingh's blood alcohol content while he was driving.

Looking to the jury charge as a whole, the first factor, we note that while the charge lacked Section 6's language, the charge instructed the jurors that they were "the exclusive judges of the facts proved, of the credibility of the witnesses, and of the weight to be given to the evidence." Nothing in the record suggests that the jury did not follow this instruction given by the court. *See Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005) (in the absence of rebuttal evidence, "the court presumes that the jury follows the trial court's instructions"). This general instruction, however, would not direct the jury to consider voluntariness specifically and offered no guidance for how to evaluate the voluntariness of Ramjattansingh's statements or any mechanism for disregarding them. *See Oursbourn v. State*, 288 S.W.3d 65, 70 (Tex. App.—Houston [1st Dist.] 2009, no pet.). This factor weighs in Ramjattansingh's favor, but in light of the other factors, it does not show actual harm. A review of the record reveals no other basis for harm.

Any conclusion that the omission of a Section 6 instruction influenced jurors is speculative. Indeed, it assumes that because there was potential for harm, that harm indeed occurred. We hold that the trial court's failure to instruct the jury under Section 6 did not do some harm to Ramjattansingh. We overrule Ramjattansingh's third issue.

**Jury Argument about Warrantless Arrest**

In his fourth issue, Ramjattansingh contends that the trial court abused its discretion by disallowing his counsel from arguing to the jury that Officer Delacruz unlawfully arrested him. Ramjattansingh posits that the jury could have concluded from the evidence that he was already under arrest when his car was towed away, which may have taken place before Officer Beaudion arrived and developed probable cause for his arrest through her investigation of whether he was driving while intoxicated.

## A. Standard of review and applicable law

We review rulings limiting the scope of closing argument for an abuse of discretion. *Vasquez v. State*, 484 S.W.3d 526, 531 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (citing *Davis v. State*, 329 S.W.3d 798, 825 (Tex. Crim. App. 2010)).

The purpose of closing argument is to help the jury draw proper conclusions from the evidence. *Gaddis v. State*, 753 S.W.2d 396, 400 (Tex. Crim. App. 1988). Counsel therefore must confine their arguments to the evidence. *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008). In general, proper jury argument by the defense consists of summarizing the evidence, drawing reasonable deductions from the evidence, and responding to the State's argument. *See id.* Defense counsel may argue any theory supported by the evidence as well as legal, fair, and legitimate

inferences from the evidence. *Vasquez*, 484 S.W.3d at 531 (citing *Wilson v. State*, 473 S.W.3d 889, 901-02 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd)).

The improper denial of a jury argument that the defense is entitled to make may constitute the denial of the right to counsel. *Davis*, 329 S.W.3d at 825. But a defendant may not make arguments contrary to the law. *Id.* Nor is he entitled to make arguments outside the evidence. *Vasquez*, 484 S.W.3d at 531 (citing *Borjan v. State*, 787 S.W.2d 53, 57 (Tex. Crim. App. 1990) (per curiam)).

## B. The trial court did not err by disallowing the defense's argument

At trial, Ramjattansingh contended that Officer Delacruz unlawfully arrested him and moved to suppress all later-gathered evidence of his intoxication. The trial court heard Ramjattansingh's motion outside the presence of the jury. During this hearing, Officer Delacruz testified that, when he arrived at the scene, he concluded that it was not safe to allow Ramjattansingh back on the road based on: (1) Ramjattansingh's signs of intoxication, specifically swaying and inability to stand still; and (2) a conversation with the tow truck driver, Wilson, who told Officer Delacruz that Ramjattansingh had almost struck other vehicles. Thus, Officer Delacruz explained, he handcuffed Ramjattansingh and put him in the back of his patrol car both for his own safety and Ramjattansingh's safety—to prevent him from falling down and sustaining an injury—to await the arrival of a DWI unit that was en route to the scene. It took that DWI unit—Officer Beaudion—about 15 minutes

28

to arrive after Officer Delacruz put Ramjattansingh in the back of the patrol car. Officer Delacruz agreed that he did not investigate whether there was probable cause to arrest Ramjattansingh. Based on this testimony, which did not differ from Officer Delacruz's later testimony before the jury, the trial court denied Ramjattansingh's motion to suppress. The trial court then entered findings and conclusions, including that Officer Delacruz had reasonable suspicion to detain Ramjattansingh until Officer Beaudion arrived to investigate and that handcuffing Ramjattansingh and placing him in the patrol car did not transform the detention into an arrest.

Ramjattansingh neither challenges the trial court's denial of his motion to suppress nor its corresponding findings of fact and conclusions of law. Instead, he argues that it was the jury's prerogative to consider whether he was arrested without probable cause and that his counsel should have been allowed to try to persuade the jury of this fact. We disagree. Whether a defendant was detained pending an investigation or arrested is a legal determination for the court to make, rather than a fact issue for resolution by the jury. *See State v. Sheppard*, 271 S.W.3d 281, 291 (Tex. Crim. App. 2008). Likewise, the trial judge decides whether the facts show probable cause. *See Dixon v. State*, 206 S.W.3d 613, 616 (Tex. Crim. App. 2006) (probable cause subject to de novo review on appeal). The trial court therefore did not abuse its discretion by disallowing the defense from arguing these issues to the jury, as the jury could not resolve questions of law.

We overrule Ramjattansingh's fourth issue.

## 911 Calls and the Confrontation Clause

In his fifth issue, Ramjattansingh contends that the trial court erred by allowing the jury to listen to a recording of Wilson's telephone call for emergency assistance. He argues that the statements made by Wilson, who did not honor a subpoena to appear at trial, were testimonial and that allowing the jury to listen to the recording therefore violated Ramjattansingh's rights under the Sixth Amendment's Confrontation Clause.

## A. Standard of review and applicable law

The Confrontation Clause provides that the accused has the right to be confronted with the witnesses against him in a criminal trial. U.S. CONST. amend. VI. Thus, it bars out-of-court testimonial statements unless the witness is unavailable to testify at trial and the defendant had had a chance to cross-examine him. *Martinez v. State*, 327 S.W.3d 727, 738 (Tex. Crim. App. 2010) (citing *Crawford v. Washington*, 541 U.S. 36, 68 (2004)). But the Confrontation Clause does not require the exclusion of non-testimonial statements. *Sanchez v. State*, 354 S.W.3d 476, 485 (Tex. Crim. App. 2011). There is not a comprehensive definition of testimonial statements. *See Langham v. State*, 305 S.W.3d 568, 575 (Tex. Crim. App. 2010); *Martinez*, 327 S.W.3d at 738 (quoting *Crawford*, 541 U.S. at 68). In general, a statement is testimonial if a reasonable person would have understood that law

30

enforcement officers were conducting a criminal investigation and collecting evidence for the purpose of prosecution. *See Wall v. State*, 184 S.W.3d 730, 745 (Tex. Crim. App. 2006). Statements made during a 911 call under circumstances objectively showing that the primary purpose of the call was to enable police assistance for an ongoing emergency, however, are not testimonial. *Cook v. State*, 199 S.W.3d 495, 497–98 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (relying on *Davis v. Washington*, 547 U.S. 813 (2006)); *see also Michigan v. Bryant*, 562 U.S. 344, 358 (2011). Whether a given statement is testimonial or not is a question of law. *Langham*, 305 S.W.3d at 576. We therefore review this issue de novo. *Wall*, 184 S.W.3d at 742.

## B.    The recording was not testimonial.

The United States Supreme Court addressed "when statements made to law enforcement personnel during a 911 call" are testimonial in *Davis*. 547 U.S. at 817. The *Davis* caller sought emergency assistance for a "domestic disturbance." *Id.* at 817. She reported that her ex-boyfriend had hit her, described the context of the assault, identified the assailant by name and birthdate, and informed the operator that he was fleeing. *Id.* at 817–18. The Court concluded that the caller was seeking help in an emergency, rather than acting as a witness or testifying, and that her statements were therefore non-testimonial. *Id.* at 828.

The Court explained that statements are not testimonial "when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Id.* at 822. In contrast, statements are testimonial "when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* Ordinarily, a 911 call serves the former purpose rather than the latter one. *See id.* at 827.

The courts consider four factors when assessing the purpose of a call, specifically whether:

(1) the caller spoke about events as they took place, rather than describing past events;

(2) the caller requested assistance for an ongoing emergency, rather than providing a narrative report of crime absent imminent danger;

(3) the operator's questions and the caller's answers were necessary to resolve a present emergency, rather than to learn of past events; and

(4) the frantic nature of the call and the issue of safety dominated over a sense of formal information gathering.

*Id.*

This Court has previously applied *Davis* in the context of a 911 call reporting a drunk driver. *See Cook*, 199 S.W.3d at 496–98. In *Cook*, an agitated caller reported that another driver had made an obscene gesture and thrown a beer bottle at his truck.

32

*Id.* at 496. The caller also told the operator that the other driver was drunk. *Id.* Our court upheld the admissibility of the emergency-assistance call because the call concerned "a potential crime in progress," was initiated by the caller, was informal, and took place at the beginning of the police investigation. *Id.* at 498; *see Ruth v. State*, 167 S.W.3d 560, 569 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) (holding that statements made during 911 call were non-testimonial after observing that nothing in record suggested "call, in which a witness to a crime in progress at her home summoned the police, deviate[d] from the typical, non-testimonial 911 call").

We conclude that, like the emergency-assistance calls in *Davis* and *Cook*, Wilson's 911 call was made mainly to enable a police response to an ongoing emergency. Wilson requested police assistance to apprehend a "drunk driver" who was "all over the road" and had almost caused multiple accidents. When Wilson called, Ramjattansingh was on the road. Wilson told the dispatcher their location and provided the make, model, color, and plate number of Ramjattansingh's car. Later, Wilson informed the dispatcher that he and Ramjattansingh had pulled into a parking lot and said that he would stay there with his truck's flashing lights on until the police arrived. While in the parking lot, Wilson could be heard speaking directly to Ramjattansingh, asking whether he had been drinking and telling him that he almost caused accidents and should not be driving. In sum, Wilson related events as they

33

happened, reporting a drunk driver who was still on the road and posed an ongoing danger, his statements were for immediate police assistance, were frequently made without prompting or in response to questioning, and were spontaneous and concerned public safety. Each of the factors identified in *Davis* and applied in *Cook* show that Wilson's 911 call was not testimonial. *See Davis*, 547 U.S. at 827–28; *Cook*, 199 S.W.3d at 498. The trial court therefore did not err in admitting the audio recording of the call.

Ramjattansingh argues that Wilson's 911 call was testimonial because its primary purpose was to serve as an out-of-court substitute for trial testimony. *See Michigan*, 562 U.S. at 358 (distinguishing non-testimonial statement from testimonial statement based on whether statement is "not procured with a primary purpose of creating an out-of-court substitute for trial testimony"). He reasons that this is so because Wilson's statements proved that Ramjattansingh "drove and operated a motor vehicle while intoxicated, events potentially relevant to later criminal prosecution." That the statements were inculpatory does not affect whether they were testimonial. Wilson's report of a drunk driver on the road concerned the sort of ongoing emergency likely to render statements made in connection with it non-testimonial. *See Cook*, 199 S.W.3d at 498. As the *Davis* Court observed, trial witnesses do not take the stand "to proclaim an emergency and seek help." 547 U.S. at 828. Wilson's call was not analogous to courtroom testimony.

Ramjattansingh further argues that any emergency dissipated once he and Wilson pulled into the parking lot. We have no quarrel with the proposition that statements that begin as a plea for emergency assistance can evolve into testimonial statements. *See Davis*, 547 U.S. at 828–29; *Langham*, 305 S.W.3d at 579. But that is not what happened here. The emergency was not contained because without the police intervention that Wilson was still seeking, Ramjattansingh could have wandered off or returned to the road and put himself and others at risk of harm.

We overrule Ramjattansingh's fifth issue.

## Conclusion

Having overruled all Ramjattansingh's issues on appeal, we affirm the trial court's judgment of conviction.

Sarah Beth Landau
Justice

Panel consists of Justices Keyes, Higley, and Landau.

Publish.  TEX. R. APP. P. 47.2(b).